IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TYRONE S. EVANS, | ) CASE NO.  1:24-CV-01077-DCN |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) JUDGE DONALD C. NUGENT |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | ) MAGISTRATE JUDGE |
| SECURITY, | ) JONATHAN D. GREENBERG |
| | ) |
| Defendant. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| | ) |

Plaintiff, Tyrone Evans ("Plaintiff" or "Evans"), challenges the final decision of Defendant Leland Dudek,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.  PROCEDURAL HISTORY

In December 2019, Evans filed an application for POD and DIB, alleging a disability onset date of June 1, 2018, and claiming he was disabled due to left leg tibia and fibula fracture, schizoaffective disorder, bipolar disorder, posttraumatic stress disorder, anxiety disorder, and depression. (Transcript

---

[1] On February 19, 2025, Leland Dudek became the Acting Commissioner of Social Security.

1

("Tr.") 17, 58.)  The application was denied initially and upon reconsideration, and Evans requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 17.)

On October 26, 2021, an ALJ held a hearing, during which Evans, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On December 3, 2021, the ALJ issued a written decision finding Evans was not disabled.  (*Id.* at 17-25.)  The ALJ's decision became final on September 9, 2022, when the Appeals Council declined further review.  (*Id.* at 1-8.)

On October 18, 2022, Evans filed his Complaint to challenge the Commissioner's final decision. (Case No. 1:22cv1881, Doc. No. 1.)  On April 6, 2023, on the stipulation of the parties, the Court remanded the case back to the Commissioner for further administrative proceedings.  (Tr. 1487.)  On remand, Evans' claim was to be sent to an administrative law judge for further consideration, an opportunity for a new hearing, further development of the administrative record as necessary to determine whether Evans was disabled within the meaning of the Social Security Act, and issuance of a new decision.  (*Id.*)

On September 8, 2023, the Appeals Council issued a Remand Order and remanded the case to the ALJ.  (*Id.* at 1490-91.)

On February 13, 2024, an ALJ held a hearing, during which Evans, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.* at 1401.)  On April 16, 2024, the ALJ issued a written decision finding Evans was not disabled.  (*Id.* at 1401-17.)

On June 25, 2024, Evans filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7, 9.)  Evans asserts the following assignments of error:

> (1)     The ALJ erroneously failed to comply with the previous order of this Court and address the supportability and consistency of the treating and reviewing sources.

     (2)     The ALJ erred at Step Three of the Sequential Evaluation when he failed to find that Plaintiff satisfied the criteria of Listing 12.04.

(Doc. No. 7.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Evans was born in September 1978 and was 45 years-old at the time of his administrative hearing (Tr. 1401, 1416), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  He has a limited education.  (Tr. 1416.)  He has past relevant work as a cook.  (*Id.*)

### B.    Relevant Medical Evidence[2]

On August 26, 2019, treatment providers admitted Evans to the hospital after his girlfriend called the police on him for threatening behavior.  (*Id.* at 272.)  A toxicology screen taken upon admission was positive for PCP and cannabis.  (*Id.*)  Treatment providers noted Evans had been using PCP since getting off probation and had been getting more dangerous and bizarre.  (*Id.*)  He had not been sleeping and he had talked about being suicidal.  (*Id.*)  Before admission, he threatened to physically harm his girlfriend, which led her to calling the police.  (*Id.*)  His girlfriend reported seeing him talking to people who were not there.  (*Id.*)  Treatment providers noted Evans had not been compliant with his medications.  (*Id.*)  During his hospitalization, Evans took his medication as prescribed "and his symptoms significantly improved."  (*Id.*)  On examination at discharge on August 30, 2019, treatment providers found Evans alert and fully oriented with soft speech, euthymic mood and affect, fair to intact concentration, fair insight and judgment, and future-oriented thought process.  (*Id.*)  Evans denied hallucinations, delusions, and suicidal

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Evans challenges only the ALJ's findings regarding his mental limitations, the Court further limits its discussion of the evidence to Evans' mental impairments.

and homicidal ideation.  (*Id.*)  Evans' diagnoses consisted of schizoaffective disorder, cannabis use disorder, stimulant use disorder, rule out antisocial personality disorder.  (*Id.* at 272-73.)

On August 29, 2019, Evans saw Elisabeth Korosec, hospital liaison, to set up outpatient psychiatric and counseling services.  (*Id.* at 769, 773.)  On examination, Korosec found Evans well-groomed with friendly behavior, good eye contact, pleasant mood, and normal speech.  (*Id.* at 769-70.)

On September 3, 2019, Evans presented to the emergency room, where he was "agitated," "obviously intoxicated," and "uncooperative."  (*Id.* at 282.)  Evans admitted to smoking PCP.  (*Id.*) Treatment providers noted he was confused, disoriented, and hyperventilating.  (*Id.*)  On examination, Evans alternatively yelled and screamed, slurred his words, and was uncooperative with examination.  (*Id.* at 283.)  After an hour, treatment providers noted Evans had sobered up and was appropriate, cooperative, and polite.  (*Id.* at 285.)  He promised to stop smoking PCP and to start taking his medication.  (*Id.*) Treatment providers noted Evans had improved 100% and discharged him home.  (*Id.*)

On September 16, 2019, Evans saw Sharon Bollinger, LPC, for his first mental health counseling session and orientation.  (*Id.* at 777.)  Evans reported being under a lot of stress, as his family was stressful, he had health problems, he was trying to stay sober, and he had no income.  (*Id.*)

On September 27, 2019, Evans went to the emergency room with complaints of difficulty urinating.  (*Id.* at 395.)  He admitted to alcohol abuse and PCP abuse.  (*Id.*)  His wife stated he would leave the house for four to five days and come home inebriated.  (*Id.*) Even when Evans was sober, he couldn't remember anything.  (*Id.*)  His wife relayed Evans had threatened to kill himself.  (*Id.*)  Evans admitted to drinking that day.  (*Id.*)  His wife stated she had taken him to get a beer before going to the emergency room because Evans needed inpatient care and the last time treatment providers would not admit him because he was sober.  (*Id.*)  On examination, treatment providers found Evans alert, relaxed, and cooperative with normal speech, normal behavior, normal cognition, coherent thought process, normal

judgment, and suicidal ideation with no plan. (*Id.* at 397.) A toxicology screen taken that day was positive for PCP and THC. (*Id.*) Treatment providers admitted Evans. (*Id.*) A mental status examination on September 28, 2019 revealed appropriate behavior, full orientation, intact memory, euthymic mood, normal speech, goal-directed thought process, no suicidal ideation or plan, and limited judgment. (*Id.* at 403-04.) Evans' diagnoses consisted of schizoaffective disorder and polysubstance abuse disorder. (*Id.* at 405.) On September 29, 2019, Evans' wife stated that Evans had poor medication compliance and poor compliance with medical appointments, and she was worried about his cognitive decline. (*Id.* at 407.) A mental status examination taken that day revealed appropriate behavior, full orientation, mildly impaired memory, inability to calculate serial sevens, euthymic mood, normal affect, normal speech, goal-directed thought processes, no suicidal ideation or plan, poor insight, and limited judgment. (*Id.* at 408.) On September 30, 2019, Evans reported he felt better and was ready for discharge. (*Id.* at 411.) Evans stated he did not use street drugs when he took his psychiatric medications and that he intended to take his medication and refrain from using alcohol and street drugs. (*Id.*) A mental status examination that day revealed normal behavior, full orientation, intact memory, the ability to recite months in reverse chronological order, normal affect, normal speech, goal-directed thought process, no suicidal ideation or plan, and limited judgment. (*Id.* at 412.) Treatment providers discharged Evans that day. (*Id.* at 418.)

On November 1, 2019, Evans saw Bollinger for counseling. (*Id.* at 786.) Evans reported being sober for two weeks, feeling guilty for not having a job, and thoughts that he would never get a job. (*Id.*) Bollinger found Evans engaged and talkative throughout the session, and he appeared fully oriented. (*Id.*)

On November 2, 2019, Evans went to the emergency room for complaints of alcohol abuse and PCP use. (*Id.* at 391-92.) Evans admitted to drinking heavily all day and using PCP that day. (*Id.* at 392.) Evans' girlfriend called 911 "as she 'did not want to deal with the patient' tonight." (*Id.*) She reported Evans had received an Abilify injection the day before, he took Depakote and Elavil, he had received 20

tabs of Tramadol at discharge from the hospital two weeks ago, and that Evans was not allowed to return to her home because of repeated drug use. (*Id.* at 394.)  Treatment providers observed Evans until he was medically sober and then discharged him to follow up with his primary care physician as needed. (*Id.*)

On December 2, 2019, Evans saw Bollinger for counseling and reported no side affects from his medications other than drowsiness. (*Id.* at 791.)  He stated he was having a hard time getting things done. (*Id.*)  On examination, Bollinger found Evans engaged and talkative, and he appeared to be fully oriented. (*Id.*)  Bollinger encouraged Evans to talk to his doctor about his drowsiness. (*Id.*)

On January 7, 2020, Evans saw Jaina Amin, M.D., for psychiatric care. (*Id.* at 832, 837.)  Evans reported an "even mood" over the past month with normal appetite and sleep, no suicidal or homicidal ideation, and no hallucinations. (*Id.* at 836.)  On examination, Dr. Amin found Evans alert and oriented with "okay" mood, full affect, normal speech, linear thought process, logical associations, no abnormal thoughts or psychosis, adequate fund of knowledge, intact memory, and fair insight and judgment. (*Id.* at 834-35.)  Evans' diagnoses consisted of schizoaffective disorder, cannabis abuse, other, mixed, or unspecified nondependent drug abuse, and PTSD. (*Id.* at 835-36.)  Dr. Amin noted Evans' PCP and THC dependance were in sustained remission. (*Id.* at 837.)  Dr. Amin continued Evans' medications. (*Id.*)

On February 24, 2020, Evans saw Bollinger for counseling and reported the death of a cousin as well as the death of Evans' pet fish. (*Id.* at 811.)  Bollinger noted Evans was "managing his grief well and that he is trying to stay positive." (*Id.*)  Evans also reported reconnecting with his wife and that they had went on a few dates. (*Id.*)  On examination, Bollinger found Evans engaged and talkative, and he appeared to be fully oriented. (*Id.*)  Evans continued to be sober and was using coping skills. (*Id.*)

On March 13, 2020, EMS brought Evans to the emergency room after Evans' girlfriend called and reported drug ingestion. (*Id.* at 860.)  Evans admitted to drinking and smoking PCP that day. (*Id.*)  Evans reported being sober for a period of time but relapsed when he got his tax return. (*Id.*)  Evans' girlfriend

stated he was acting confused and had been compliant with his medications. (*Id.* at 861.) Treatment providers noted Evans was "somewhat confused" but cooperative, although he was unable to answer many questions. (*Id.*) On examination, treatment providers found Evans alert but disoriented with normal speech, normal behavior, normal thought content, and normal judgment. (*Id.* at 862.) Evans did not want to undergo rehabilitation. (*Id.* at 863.) A toxicology screen taken that day was positive. (*Id.*) Evans received IV fluids. (*Id.*) Upon reexamination, treatment providers found Evans alert and conversant. (*Id.*) Evans wanted to go home, and treatment providers discharged him to follow up with his mental health provider. (*Id.*)

On May 1, 2020, Evans completed an Adult Function Report and stated that his medication made him tired and unable to concentrate. (*Id.* at 213, 218.) On a typical day, he wakes up, takes his medicine, watches TV, spends time with his family, and goes to bed. (*Id.* at 214.) He reported big household chores made him tired easily because of his medications. (*Id.* at 215.) He did not drive because his license was suspended. (*Id.*) He shopped in stores for food once a week for two hours. (*Id.*) He could count change, handle a savings account, and use a checkbook/money order but could not pay bills because he needed reminders. (*Id.*) He reported getting frustrated easily with simple things. (*Id.* at 216.) He struggled to follow directions and remember simple tasks. (*Id.*) He could pay attention for 30 minutes. (*Id.*) He did not finish what he started. (*Id.*) He followed written instructions "fairly well," although he needed reminders or would have to write down spoken instructions. (*Id.*) He got along with authority figures "fairly well" overall. (*Id.* at 217.) He struggled with managing stress but tried to use the skills he had been working on with his therapist. (*Id.*) He needed some time to adjust to changes in routine. (*Id.*) He reported seeing and hearing things that others did not. (*Id.*)

On October 6, 2020, Evans saw Bollinger for counseling and reported doing well overall. (*Id.* at 915-16.) Evans told Bollinger that for the first time in a long time, he went the entire month of September

without needing to go to the hospital.  (*Id.* at 915.)  Evans reported "his medications [were] very helpful for keeping him on track," and he was staying sober and continued to be on good terms with his family. (*Id.*)  On examination, Bollinger found Evans engaged and talkative, and he appeared to be fully oriented. (*Id.*)

On January 19, 2021, Evans saw Dr. Amin for psychiatric follow up.  (*Id.* at 1372.)  Evans reported "doing okay" overall and that he moved the time of his Depakote dosage as it was making him tired.  (*Id.* at 1378.)  He denied any other medication side effects.  (*Id.*)  Evans felt his medications helped keep his mental health stable and he did not request any changes.  (*Id.*)  On examination, Dr. Amin found even mood, regular speech, linear, rational, and goal-oriented thinking, no suicidal or homicidal ideation, fair insight, good judgment, full orientation, and adequate fund of knowledge.  (*Id.*)  Dr. Amin continued Evans' medications.  (*Id.* at 1379.)

On August 10, 2021, Dr. Amin completed a Mental Impairment Questionnaire.  (*Id.* at 933-34.) Evans' diagnoses consisted of PTSD and alcohol dependence in remission since March 31, 2020.  (*Id.*at 933.)  Dr. Amin listed the following as the clinical findings supporting the severity of Evans' mental health impairment and symptoms: pain; inability to be around people without anxiety or worry; and poor functioning.  (*Id.*)  Dr. Amin described Evans' prognosis as poor.  (*Id.*)  Dr. Amin opined Evans had no useful ability to function in the following areas: carry out detailed instructions; perform activities within a schedule; work in coordination or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; understand and remember detailed instructions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic

8

goals or make plans independently of others. (*Id.* at 933-34.) Dr. Amin further opined Evans was unable to meet competitive standards in the following areas: carry out very short and simple instructions; maintain attention and concentration for extended periods; manage regular attendance and be punctual within customary tolerances; remember locations and work-like procedures; understand and remember very short and simple instructions; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions. (*Id.*) Dr. Amin opined Evans would be absent from work 50% of the month and off-task 50% of the workday. (*Id.* at 934.)

On September 21, 2021, Evans saw Bollinger for counseling. (*Id.* at 2014.) On examination, Bollinger found appropriate appearance, generally relaxed, engaged, and cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate insight and judgment. (*Id.* at 2015.)

On November 9, 2021, Evans saw Bollinger for counseling. (*Id.* at 1997.) Evans told Bollinger "he [did] not remember being dazed and less responsive" at his last counseling session. (*Id.* at 1998.) Bollinger noted Evans was more engaged and responsive. (*Id.*) On examination, Bollinger found relaxed, engaged, and cooperative behavior, unremarkable speech, neutral mood, appropriate affect, unremarkable thought content and perception, and appropriate insight and judgment. (*Id.*)

That same day, Evans saw Dr. Amin for psychiatric follow up. (*Id.* at 2002.) Evans endorsed nervousness and anxiety but denied sadness, restlessness, mania, inflated self-esteem, euphoric mood, hallucinations, difficulty concentrating, increased fatigue, appetite change, weight change, suicidal thoughts, sleep disturbance, and homicidal ideas. (*Id.* at 2003.) Evans spent his days at home and read things from the library. (*Id.*) Evans reported medication compliance and denied depression or anxiety that interfered with his daily life. (*Id.*) Evans denied using illegal drugs "as he found this was interfering with his mental health meds and making sym worse." (*Id.*) On examination, Dr. Amin found normal speech,

neutral/euthymic mood, cooperative demeanor, normal thought content, goal-directed and linear thought process, full orientation, intact memory, and fair insight and judgment. (*Id.* at 2004.)

On November 30, 2021, Evans saw Bollinger for counseling and reported he had had a good holiday, although he continued to struggle with back pain. (*Id.* at 1994-95.) On examination, Bollinger found generally relaxed, engaged, and cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate judgment and insight. (*Id.* at 1995.)

On January 6, 2022, Evans saw Bollinger for counseling and reported that overall, he was doing well, although he was disappointed that he had been denied Social Security benefits. (*Id.* at 1986-87.) On examination, Bollinger found appropriate appearance, relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment. (*Id.* at 1987.)

On February 8, 2022, Evans saw Dr. Amin for psychiatric follow up. (*Id.* at 1977.) Evans denied any medication issues. (*Id.*) He told Dr. Amin that Elavil helped his sleep, he completed his activities and activities of daily living, his mood had been even, and he had been compliant with his medications. (*Id.*) Dr. Amin noted that Evans was medically stable. (*Id.*) On examination, Dr. Amin found normal speech, neutral/euthymic mood, normal thought content, goal-directed and linear thought process, cooperative demeanor, full orientation, intact memory, and fair insight and judgment. (*Id.* at 1979-80.)

On March 2, 2022, Evans saw Bollinger for counseling. (*Id.* at 1973.) Evans reported difficulty at home, as his wife had lost her job and they had gotten custody of his 14-year-old nephew. (*Id.*) On examination, Bollinger found appropriate appearance, relaxed, engaged, and cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment. (*Id.* at 1974.) Bollinger found Evans had made moderate improvement. (*Id.*)

10

On March 23, 2022, Evans saw Bollinger for counseling. (*Id.* at 1969.) On examination, Bollinger found appropriate appearance, relaxed, engaged, and cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment. (*Id.* at 1970.) Bollinger noted Evans had made significant improvement. (*Id.*)

On April 13, 2022, Evans saw Bollinger for counseling. (*Id.* at 1967.) On examination, Bollinger found appropriate appearance, relaxed, engaged, and cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment. (*Id.* at 1968.) Bollinger noted Evans had made minimal improvement. (*Id.*)

On May 10, 2022, Evans saw Dr. Amin for psychiatric follow up. (*Id.* at 1953-54.) Evans reported medication compliance and doing well overall, although he continued to sleep poorly without a CPAP machine. (*Id.* at 1954.) On examination, Dr. Amin found normal speech, neutral/euthymic mood, normal thought content with no depressive cognitions, goal-directed and linear thought process, cooperative demeanor, full orientation, intact memory, and fair insight and judgment. (*Id.* at 1956.)

On May 11, 2022, Evans saw Bollinger for counseling. (*Id.* at 1946.) On examination, Bollinger found appropriate appearance, cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment. (*Id.* at 1947.) Bollinger noted Evans had made moderate improvement. (*Id.*)

On June 8, 2022, Evans saw Bollinger for counseling. (*Id.* at 1937.) On examination, Bollinger found appropriate appearance, relaxed, engaged, and cooperative behavior, normal speech, neutral mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment. (*Id.* at 1938.) Bollinger noted Evans had made minimal improvement. (*Id.*)

On July 6, 2022, Evans saw Bollinger for counseling. (*Id.* at 1918.) On examination, Bollinger found appropriate appearance, relaxed, engaged, and cooperative behavior, normal speech, sad mood,

11

appropriate affect, normal thought content and perception, and appropriate insight and judgment.  (*Id.* at 1919.)  Bollinger noted Evans had made minimal improvement.  (*Id.*)

On July 26, 2022, Evans saw Dr. Amin for psychiatric follow up.  (*Id.* at 1908.)  He reported medication compliance and "doing okay overall."  (*Id.* at 1909.)  Dr. Amin noted Evans was future-oriented and had no negative thoughts.  (*Id.*)  On examination, Dr. Amin found normal speech, neutral/euthymic mood, normal thought content with no depressive cognitions, goal-directed and linear thought process, normal perception, cooperative demeanor, fair insight and judgment, and intact memory.  (*Id.* at 1911.)

On August 3, 2022, Evans saw Bollinger for counseling and reported that a sibling of his had colon cancer and he was very worried.  (*Id.* at 1899.)  On examination, Bollinger found appropriate appearance, cooperative, irritable, and anxious behavior, normal speech, nervous, anxious mood, appropriate affect, normal thought content and perception, and appropriate insight and judgment.  (*Id.* at 1900.)

On August 31, 2022, Evans saw Bollinger for counseling and reported his sister had passed away a few days ago.  (*Id.* at 1890-91.)  On examination, Bollinger found appropriate appearance, cooperative, behavior, normal speech, sad mood, appropriate affect, normal thought content, normal perception, and appropriate insight and judgment.  (*Id.* at 1891.)

On October 18, 2022, Evans saw Dr. Amin for psychiatric follow up.  (*Id.* at 1873.)  Evans reported "doing okay"; he was compliant with his medications and denied any issues or side effects.  (*Id.* at 1874.)  Evans told Dr. Amin that he did not do much day to day because of his back pain.  (*Id.*)  He reported good sleep.  (*Id.*)  Evans stated that Depakote helped him "a lot" and helped with the voices.  (*Id.*)  Evans denied suicidal and homicidal ideation and hallucinations.  (*Id.*)  On examination, Dr. Amin found normal speech, neutral/euthymic mood, normal thought content, goal-directed and linear thought

process, normal perception, alert attention, cooperative demeanor, fair judgment and insight, full orientation, and grossly intact memory. (*Id.* at 1876.)

On November 9, 2022, Evans saw Bollinger for counseling. (*Id.* at 1866.) Evans reported "feeling pretty depressed," as his wife was having a hard time paying the bills and he couldn't contribute. (*Id.*) On examination, Bollinger found full orientation, sad expression, polite conversation, appropriate appearance, cooperative behavior, normal speech, sad mood, appropriate affect, depressive cognitions, normal perception, and appropriate judgment and insight. (*Id.* at 1867.) Bollinger found Evans had made minimal improvement since their last session. (*Id.*) Evans' diagnoses consisted of PTSD and generalized anxiety disorder. (*Id.*)

On December 7, 2022, Evans saw Bollinger for counseling and reported his wife's grandson had died. (*Id.* at 1859-60.) On examination, Bollinger found relaxed and engaged behavior, normal speech, normal perception, neutral mood, appropriate affect, normal thought content, and appropriate insight and judgment. (*Id.* at 1860.)

On January 11, 2023, Evans saw Brandon Rodriguez, SWT. (*Id.* at 1850.) Rodriguez noted Evans demonstrated decreased symptoms, increased skills or knowledge, and increased insight. (*Id.* at 1851.)

On March 13, 2023, Evans saw Dr. Amin for psychiatric follow up. (*Id.* at 3607.) Evans reported feeling good on his current medications. (*Id.* at 3608.) Evans told Dr. Amin he still had a tremor, although Cogentin had helped. (*Id.*) He denied any other medication side effects. (*Id.*) Dr. Amin noted that Evans was stable. (*Id.*) On examination, Dr. Amin found Evans alert and oriented with good eye contact, calm motor activity, normal speech, neutral/euthymic mood, normal thought content, goal-directed and linear thought process, normal perception, fair insight and judgment, and intact memory. (*Id.* at 3610-11.)

13

On August 3, 2023, Evans saw Dr. Amin for psychiatric follow up and reported that he was "doing good," and had "[n]o issues with the meds or his mental health." (*Id.* at 3557-58.) On examination, Dr. Amin found good eye contact, normal motor activity, normal speech, neutral/euthymic mood, full affect, normal thought content, goal-directed and linear thought process, normal thought process, fair insight and judgment, and intact memory. (*Id.* at 3561.)

On August 30, 2023, Evans saw Bollinger for counseling. (*Id.* at 3554.) On examination, Bollinger found appropriate appearance, cooperative behavior, normal speech, neutral mood, appropriate affect, normal perception, and appropriate insight and judgment. (*Id.* at 3555.)

On September 19, 2023, Evans saw Dr. Amin for psychiatric follow up and reported being depressed and sad as it was the anniversary of his mother's death. (*Id.* at 3547-48.) On examination, Dr. Amin found good eye contact, calm motor activity, normal speech, sad and depressed mood, full range of affect, depressive thought content, goal-directed and linear thought process, cooperative demeanor, fair insight and judgment, and intact memory. (*Id.* at 3551.)

On September 27, 2023, Evans saw Bollinger for counseling and reported being "pretty depressed" and worried about his wife. (*Id.* at 3538-39.) On examination, Bollinger found appropriate appearance, cooperative behavior, normal speech, normal perception, depressed mood, appropriate affect, depressive cognitions, and appropriate insight and judgment. (*Id.* at 3539.)

On December 28, 2023, Evans saw Dr. Amin for medication management and injection. (*Id.* at 3488.) Evans' wife attended the appointment and reported Evans was "having a lot of short term memory issues." (*Id.*) She told Dr. Amin she was concerned about dementia as Evans was a heavy drinker and continued to drink on occasion. (*Id.*) Evans denied getting lost when going home but admitted to getting lost when using GPS on occasion. (*Id.*) Sometimes he would arrive at a place and forget how he got there. (*Id.*) Once he was talking to a family member and later could not remember to whom he was

speaking. (*Id.*) On examination, Dr. Amin found good eye contact, calm motor activity, normal speech, anxious mood, congruent affect, normal thought content, goal-directed and linear thought process, perceptual disturbances, alert attention, cooperative demeanor, fair insight and judgment, full orientation, and grossly intact memory. (*Id.* at 3491-92.) Dr. Amin continued Evans' medications. (*Id.* at 3493-94.)

That same day, Dr. Amin completed another Mental Impairment Questionnaire. (*Id.* at 3485-86.) Evans' diagnoses consisted of other schizoaffective disorder and PTSD. (*Id.* at 3485.) Dr. Amin described Evans' prognosis as poor. (*Id.*) Dr. Amin opined Evans had no useful ability to function in the following areas: carry out detailed instructions; maintain attention and concentration for extended periods; maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; remember locations and work-like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. (*Id.* at 3485-86.) Dr. Amin further opined Evans was unable to meet competitive standards in the following areas: carry out very short and simple instructions; perform activities within a schedule; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. (*Id.*) Dr. Amin opined Evans would be absent from work more than 50% of the month and off-task 80% of the workday. (*Id.* at 3486.)

On February 2, 2024, Evans went to the emergency room after his wife called 911 for his intoxication and agitation. (*Id.* at 3642.) His wife stated she got home from work and could tell he had been drinking. (*Id.*) She later found him in the yard, where he was scared and yelling. (*Id.*) He felt like the world was going to end and he was hallucinating and trying not step on whatever he saw. (*Id.*) His wife reported she was concerned he had used PCP; he had been clean for years, but recently three family members had died, and she was afraid this may have triggered a relapse. (*Id.*) Evans denied using PCP but admitted to alcohol and marijuana use. (*Id.*) On examination, treatment providers found Evans alert and fully oriented with normal mood, normal behavior, and normal thought content. (*Id.* at 3644.) Evans' initial physical presentment concerned treatment providers, and they monitored Evans until ruling out pulmonary embolism. (*Id.* at 3644-49.)

## C.     State Agency Reports

On June 8, 2020, Joan Williams, Ph.D., reviewed the file and opined Evans had moderate limitations in his ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. (*Id.* at 61.) Dr. Williams further opined that the record evidence did not establish the presence of "C" criteria. (*Id.*) Dr. Williams determined Evans retained the ability to complete repetitive tasks at a production pace in a static setting. (*Id.* at 63.) Evans would work best in a solitary position, but he retained the ability to superficially relate with others. (*Id.*) Dr. Williams opined that all changes should be explained in advance. (*Id.*)

On November 18, 2020, on reconsideration, Emias Seleshi, M.D., affirmed Dr. Williams' findings regarding the Paragraph B and C criteria. (*Id.* at 70.) Dr. Seleshi opined Evans could perform routine tasks with flexible considerations for close concentration or fast-paced performance. (*Id.* at 72.) Evans could interact with others on a brief, superficial, and intermittent basis in the work setting. (*Id.*) Dr.

Seleshi further opined Evans could adapt to work in a stable setting with predictable expectations and well-explained, infrequent routine changes.  (*Id.*)

D.    **Hearing Testimony**

During the February 13, 2024 hearing, Evans testified to the following:

- It has been a long time since he drank alcohol or used any illegal substances.  (*Id.* at 1434.)  It has been at least a year.  (*Id.* at 1434-36.)

- He goes for counseling twice a month.  (*Id.* at 1437.)  He told his counselor he was "really depressed" and so many deaths in his family caused depression.  (*Id.*)  His aunt had passed away a week ago and that was the third person to pass away this year.  (*Id.*)  His mental health is bad right now.  (*Id.* at 1438.)  He keeps to himself.  (*Id.*)  He stays in dark rooms with the shades closed.  (*Id.*)  He feels alone and that he cannot do anything for himself or others, and that makes him even more depressed.  (*Id.* at 1439.)  He rarely leaves the house.  (*Id.*)  His energy level has been bad, and it got worse after he had COVID.  (*Id.*)  He cannot even cook for himself now, which makes him more depressed.  (*Id.*)  He doesn't spend time with his wife.  (*Id.* at 1440.)  He hasn't seen his daughter in two years, maybe longer.  (*Id.*)  He doesn't talk to anyone except his counselor and his psychiatrist.  (*Id.*)

- His memory is very bad.  (*Id.* at 1441.)  He forgets things five to ten minutes after talking about them.  (*Id.*)  He struggles to remember to take his medication and keep his appointments.  (*Id.*)  His wife must remind him every night to take his medication.  (*Id.*)  He struggles with staying asleep.  (*Id.* at 1442.)  His poor sleep impacts his mood the next day.  (*Id.*)  He has a hard time concentrating too.  (*Id.* at 1442-43.)  He may be sitting in his chair, and he'll catch himself falling asleep during the day.  (*Id.* at 1443.)  There are days where he does not get out of bed.  (*Id.*)  He showers maybe once a week.  (*Id.*)  His depression causes him to not want to shower or change his clothes two to three times a week.  (*Id.* at 1444.)

- He doesn't watch much TV.  (*Id.* at 1442.)  He likes to listen to the radio.  (*Id.*)

- His medications help a lot and make him feel a lot better.  (*Id.*)

The VE testified Evans had past work as a cook.  (*Id.* at 1451.)  The ALJ then posed the following hypothetical question:

> And then so this is an individual, for this example we'll say a 9th grade education and again with the work background you described, and again a younger individual, 45 years and five months approximately at this time. . . . I'd like you to assume he could perform work at the medium exertional level, he must avoid concentrated exposure to pulmonary irritants as defined by the Selected Characteristics of Occupations, he can understand, remember, and

17

> follow simple instructions for routine and repetitive tasks without fast-paced production-type work.  Although he'd do best in a solitary position, he can interact with others on a brief, superficial, and intermittent basis in the work setting.  He can adapt to work in a stable setting with predictable expectations and well explained and frequent routine changes, if any.  This – superficial means interaction sufficient to make and convey simple judgments and to follow simple instructions, simple work tasks, routines, social exchanges, and adjustments.  This – I also want to note a solitary activity is one that a person performs alone, but it does not mean isolation.
>
> And with that description, would that individual be able to perform any of Mr. Evans's past work or other work in the national economy?

(*Id.* at 1453.)

The VE testified the hypothetical individual would not be able to perform Evans' past work as a cook.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as hospital cleaner, kitchen helper, and cleaner.  (*Id.* at 1454.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.

20 C.F.R. § 404.1520(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Evans was insured on the alleged disability onset date, June 1, 2018, and remained insured through December 31, 2024, the date last insured ("DLI").  (Tr. 1401-02.) Therefore, in order to be entitled to POD and DIB, Evans must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2.   The claimant has engaged in substantial gainful activity since June 1, 2018, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3.      The claimant has the following severe impairments: sciatica, chronic obstructive pulmonary disease (COPD), asthma, emphysema, post-traumatic arthritis of the knee; obesity, polysubstance dependence/abuse, post-traumatic stress disorder (PTSD), and schizoaffective disorder (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant must avoid concentrated exposure to pulmonary irritants as defined by the Selected Characteristics of Occupations (SCO). The claimant can understand, remember, and follow simple instructions for routine and repetitive tasks. The claimant cannot perform fast-paced production type work. Although he would do best in a solitary position, the claimant can interact with others on a brief, superficial, and intermittent basis in the work setting. The claimant can adapt to work in a stable setting with predictable expectations and well explained infrequent routine changes. Superficial means interaction sufficient to make and convey simple judgments and to follow simple instructions. The claimant can perform simple work tasks, routines, social exchanges, and adjustments. A solitary activity is not one performed in isolation, but rather one that a person performs alone (as opposed to tandem tasks).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on September **, 1978 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has a limited education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 1403-17.)

20

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.    First Assignment of Error: Step Three

In his second assignment of error, Evans argues the ALJ erred at Step Three when he failed to find that Evans satisfied the criteria of Listing 12.04. (Doc. No. 7 at 16.)  Evans asserts that the ALJ "failed to support his Part 'B' analysis and conclusion" as the ALJ's findings were in error and contrary to the evidence in the record.  (*Id.* at 20.)  In addition, Evans argues the ALJ erred by failing to explain or

support the ALJ's conclusion that the evidence failed to establish the presence of "Paragraph C" criteria. (*Id.* at 21.) Therefore, remand is required. (*Id.* at 22.)

The Commissioner responds that Evans fails to show he met or equaled Listing 12.04, and substantial evidence supports the ALJ's findings that Evans' mental impairments did not meet or equal Listing 12.04. (Doc. No. 9 at 8.) The Commissioner states that "[w]hile Plaintiff spends multiple pages laying out the medical evidence most favorable to him, he never once identifies which functional domains he allegedly satisfies to meet or equal Listing 12.04," which is "fatal" to Evans' argument. (*Id.* at 9-10.) The Commissioner fails to address Evans' Paragraph C argument.

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. § 40.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 521, 107 L.Ed.2d 967 (1990). A claimant is also disabled if his

impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his or her decision. *Id.* at 416-17.

Listing 12.00, the introductory paragraph to the mental disorder Listings of 20 C.F.R. Pt. 404, Subpt. P, App. 1, states in relevant part:

> 2. Listings 12.07, 12.08, 12.10, 12.11, and 12.13 have two paragraphs, designated A and B; your mental disorder must satisfy the requirements of both paragraphs A and B. Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs, designated A, B, and C; your mental disorder must satisfy the requirements of both paragraphs A and B, or the requirements of both paragraphs A and C. Listing 12.05 has two paragraphs that are unique to that listing (see 12.00A3); your mental disorder must satisfy the requirements of either paragraph A or paragraph B.
>
> a. Paragraph A of each listing (except 12.05) includes the medical criteria that must be present in your medical evidence.
>
> b. Paragraph B of each listing (except 12.05) provides the functional criteria we assess, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how your mental disorder limits your functioning. These criteria represent the areas of mental functioning a person uses in a work setting. They are: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. We will determine the degree to which your medically determinable mental impairment affects the four areas of mental functioning and your ability to function independently, appropriately, effectively, and on a sustained basis (see §§ 404.1520a(c)(2) and 416.920a(c)(2) of this chapter). To satisfy the paragraph B criteria, your mental disorder must result in "extreme" limitation of one, or "marked" limitation of two, of the four areas of mental functioning. (When we refer to "paragraph B criteria" or "area[s] of mental functioning" in the introductory text of this body system, we mean the criteria in paragraph B of every listing except 12.05.)

24

Listing 12.00 of 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added).

The Paragraph C criteria are used to evaluate "serious and persistent" mental disorders. 20 C.F.R Pt. 404, Subpt. P, App. 1. The Paragraph C criteria are intended to recognize that mental health treatment may control the more obvious symptoms and signs of the claimant's mental disorder. *Id.* To satisfy the Paragraph C criteria, the evidence must show: (1) the claimant relies on ongoing medical treatment therapy, psychosocial supports, or a highly structured setting to diminish the symptoms of the mental disorder; and (2) the claimant is able to obtain only "marginal adjustment" even when the above supports diminish the claimant's mental disorder symptoms. *Id.* Listing 12.00(G) defines "marginal adjustment" as the claimant has minimal capacity to adapt to changes in environment, has deterioration in functioning, and may be unable to function outside of the home or supportive setting. *Id.* Evidence may also show this deterioration has resulted in significant changes in medication, absence from work, or hospitalization. *Id.*

Thus, in order for Evans to meet Listing 12.04, he must meet the criteria of paragraph A[3] and paragraph B, or Paragraph A and Paragraph C, of that Listing.

At Step Three, the ALJ found as follows:

> Finally, the severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.03, 12.04, and 12.15. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.
>
> In understanding, remembering or applying information, the claimant has a moderate limitation. The claimant has reported that his impairments affect his ability to remember, understand, and follow instructions (4E; hearing testimony). He indicated that while he is able to follow written instructions "fairly well," he needs reminders when following spoken instructions, or needs to write them down (4E). The evidence of record reflects that the

---

[3] As Evans challenges only the ALJ's analysis of 12.04(B)-(C), the Court shall not discuss 12.04(A).

claimant has no problems tending to personal care, is able to leave his home independently, shops in stores, and is able to handle money (count change, use a savings/checking account) with reminders (4E). Further, the claimant's treating and examining providers have not noted significant, ongoing deficits in this domain. While the claimant has exhibited abnormalities in mental status in the context of substance use, he has generally been described as having adequate/grossly intact memory and average fund of knowledge (see e.g., 1F/14; 4F/81-82; 15F; 19F). In sum, while the claimant has limitations in this domain, the evidence of record does not support a finding that these are more than moderate.

In interacting with others, the claimant has a moderate limitation. The claimant has reported that his impairments affect his ability to get along with others (family, friends, neighbors), as he is easily frustrated (4E). The claimant testified that he needs to be alone at times. However, he has also reported that he gets along fairly well with authority figures and denied ever having lost a job due to problems getting along with other people (4E). Further, the evidence of record reflects that he has maintained relationships with a significant other and family members, leaves his home 3 to 4 times per week, and spends time talking to his brother daily (see 4E; 4F/70, 76). April 2021 therapy notes document his report of spending time with his cousins playing pool and cooking (12F/18). Finally, the claimant's treating and examining providers have not noted significant, ongoing deficits in this domain. While the claimant has exhibited abnormalities in mental status in the context of substance use (e.g., agitated, loud), he is otherwise described as having appropriate appearance and interaction (e.g., calm, in good behavioral control, polite) (see e.g., 1F/14, 27; 16F; 4F/81-82; 16F/227, 229, 299, 563; 19F). In sum, while the claimant has limitations in this domain, the evidence of record does not support a finding that these are more than moderate.

With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. The claimant has reported that his impairments affect his ability to concentrate and complete tasks (4E). He reported that he can pay attention for only 30 minutes and does not finish what he starts (4E). However, the evidence of record reflects that he tends to personal care without difficulty, shops in stores, assists with household chores, and spends time watching television (4E; 19F/49, 142). Further, the claimant's treating and examining providers have not noted significant, ongoing deficits in this domain. While the claimant has exhibited abnormalities in mental status in the context of substance use, he is otherwise described as being alert and oriented, with adequate concentration (fair to intact) (see e.g., 1F/14; 4F/81-82 14F; 16F). In sum, while the claimant has limitations in this domain, the evidence of record does not support a finding that these are more than moderate.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant has reported that while he does okay with handling changes in routine with some time to adjust, he struggles with handling stress

26

(4E). The claimant testified that he needs to be alone at times and does not leave his home often. However, the evidence of record reflects that he has reported tending to personal care without difficulty, assisting with household chores, leaving his home 3 to 4 times per week, shopping in stores, and spending time with his significant other and family members (4E; 4F/70, 76; 12F/18). Further, the claimant's treating and examining providers have not noted significant, ongoing deficits in this domain. While the claimant has exhibited abnormalities in mental status in the context of substance use (e.g., agitated, loud, impaired judgment), he is otherwise described as having appropriate appearance and interaction (e.g., calm, in good behavioral control, polite) and at least fair judgment (see e.g., 1F/14, 18, 27; 4F/81-82; 16F; 16F/227, 229, 299, 563). The record reflects that he regularly attends appointments and engages appropriately in treatment (see e.g., 16F; 19F; 20F). In sum, while the claimant has limitations in this domain, the evidence of record does not support a finding that these are more than moderate.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the paragraph C criteria were satisfied. In this case, the evidence fails to establish the presence of the paragraph C criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

(Tr. 1406-08.)

The Court finds substantial evidence supports the ALJ's Step Three findings. First, as the Commissioner points out, Evans fails to identify which functional domains he claims to satisfy to meet or equal Listing 12.04(B). Second, the ALJ thoroughly discussed the record evidence regarding Evans' mental impairments at Step Three and in his RFC analysis. As the ALJ's decision and this Court's review of the record makes clear, the medical findings within the treatment records are mixed. The ALJ highlighted the mixed findings in the record, including those supporting a finding of disability. (Tr. 1406-08, 1411-16.) The ALJ explained how he weighed the evidence and resolved any conflicts. (*Id.*) Furthermore, the state agency reviewing psychologists opined that Evans did not meet or equal a listing. (*Id.* at 61, 70.)

The substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035. "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility." *Postell v. Comm'r of Soc. Sec.*, No. 16-13645, 2018 WL 1477128, at *10 (E.D. Mich. Mar. 1, 2018), *report and recommendation adopted by* 2018 WL 1471445 (E.D. Mich. Mar. 26, 2018). Here, the ALJ's Step Three findings that Evans did not meet or equal the requirements of Listing 12.04 is within that "zone of choice" and thus supported by substantial evidence.

"Reciting medical evidence does not show that the ALJ's decision is not supported by substantial evidence." *Garcia v. Comm'r of Soc. Sec.*, Case No. 1:22-cv-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023). And the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

There is no error.

**B.      Second Assignment of Error: Compliance with Remand Order**

In his first assignment of error, Evans argues that the ALJ failed to comply with the remand order of this Court and failed to address the supportability and consistency of the treating and reviewing sources. (Doc. No. 7 at 8.) Evans asserts the ALJ "once again failed to support his conclusions" and contrary to the ALJ's findings, "the opinions of Dr. Amin were supported by and consistent with the evidence" set forth in Evans' brief. (*Id.* at 13.) Evans further argues that the "selective adoption of the state agency opinion established that the ALJ's conclusion was neither supported by nor consistent with the evidence."[4] (*Id.* at

---

[4] Following this statement, in a single sentence, Evans argues that the ALJ's RFC "therefore[] was not supported by substantial evidence necessitating a remand." (Doc. No. 7 at 14.) As the Commissioner points out, Evans "nests a challenge to the ALJ's articulation of the RFC limitations inside an argument that the ALJ did not sufficiently evaluate the mental limitations from the state agency reviewing psychologists." (Doc. No. 9 at 14.) The Court finds Evans' RFC argument waived for lack of development. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a

14.)  Evans maintains that the evidence supported that he would be unable to sustain work on a full-time basis.  (*Id.*)  Without explanation, Evans asserts that the ALJ offered an inadequate analysis and failed to provide a coherent explanation in support of his findings.  (*Id.* at 15.)

The Commissioner responds that substantial evidence supports the ALJ's findings that the opinions of treating psychiatrist Dr. Amin were unpersuasive, as the ALJ found these opinions unsupported by and inconsistent with other evidence in the record.  (Doc. No. 9 at 11-13.)

The Sixth Circuit has held that, where a federal district court has reversed the Commissioner's final decision and remanded the case for further proceedings, "it is the duty of ... the agency from which appeal is taken ... to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions."  *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967). As the Sixth Circuit later explained:

> In some Social Security cases, district courts will include detailed instructions concerning the scope of the remand and the issues to be addressed. In such cases, "[d]eviation from the court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886, 109 S.Ct. 2248, 104 L.Ed.2d 941 (1989).  *See also Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967) ... These cases stand for the proposition that the administrative law judge may

---

perfunctory manner, are waived.").  Furthermore, the Court has consistently warned Plaintiff's counsel against conflating different challenges to the ALJ's decision in a single assignment of error and that counsel's failure to present arguments in a way that the Court can address them, and Defendant can respond to them, may result, in the future, in the Court deeming an argument to be improper.  The Court finds this RFC argument to be improperly raised. Therefore, the Court recommends this argument be deemed waived and stricken. *ACLU of Ky. v. McCreary Cty. Ky.*, 607 F.3d 439, 451 (6th Cir. 2010) ("[A] district court has broad discretion to manage its docket."). *See also Bowles v. City of Cleveland*, 129 F. App'x 239, 241 (6th Cir. 2005) ("[A] district court has inherent power to 'protect[ ] the due and orderly administration of justice and ... maintain [ ] the authority and dignity of the court....'") (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)); *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 516 (6th Cir. 2003) ("[T]rial courts have inherent power to control their dockets."). Even if this argument is not found waived, it is meritless.  The ALJ explained at the hearing that the state agency reviewing psychologist's opinion regarding a solitary position was not the most Evans could do, as required by the RFC, but rather the best he could do.  (Tr. 1457-58.)  Furthermore, the ALJ defined solitary as an activity a person could perform alone, but it did not mean isolation.  (*Id.* at 1453.)

> not do anything expressly or impliedly in contradiction to the district court's remand order.

*Hollins v. Massanari*, 49 F. App'x 533, 536 (6th Cir. 2002). In addition, "[w]hen the Appeals Council issues a remand order to an ALJ, the ALJ must 'take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order.'" *Wilson v. Comm'r of Soc. Sec.*, 783 F. App'x 489, 496 (6th Cir. 2019) (quoting 20 C.F.R. § 404.977(b)). *See also Kaddo v. Comm'r of Soc. Sec.*, 238 F. Supp. 3d 939, 944 (E.D. Mich. 2017) ("[T]he failure by an ALJ to follow a remand order from the Appeals Council, even if that failure is allowed to stand by a later Appeals Council ruling, can constitute a reversible error in federal court. This holds true regardless of whether substantial evidence otherwise supports the Commissioner's final decision.").

Since Evans' claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[5] (2) consistency;[6] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment

---

[5] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[6] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)).   A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The Remand Order from the Appeals Council states, in pertinent part, as follows:

> Further evaluation of the opinion evidence is required pursuant to 20 CFR 404.1520c. In the hearing decision, the Administrative Law Judge considered the prior administrative medical findings (PAMFs) from the state agency psychological consultants Joan Williams, Ph.D., and Ermias Seleshi, M.D., and concluded these findings were somewhat persuasive. As the decision stated, "These administrative findings are somewhat persuasive. The record does not support a production pace. The claimant has also improved with compliance with medication and abstinence from PCP" (Decision, page 7). The phrasing was a little unclear, but it appears the Administrative Law Judge rejected the PAMFs regarding the claimant's ability to work at a production-pace level, based on a comparison of Dr. Williams' statement at the initial level at Exhibit 1A, page 6, that the claimant "retains the ability to complete repetitive tasks at a production pace, in a static setting," and the residual functional capacity finding that the claimant "can perform routine tasks with no fast pace production type work." However, the hearing decision did not include an evaluation of the supportability and consistency factors and appeared to consider the claimant's PCP use without performing a materiality evaluation as outlined in Social Security Ruling 13-2p.
>
> Moreover, the Administrative Law Judge considered the August 2021 mental impairment questionnaire from Jaina Amin, M.D., finding the opinion less persuasive, in part, because it was inconsistent with multiple good mental status examinations and Dr. Amin did not discuss ongoing marijuana use in the questionnaire (Decision, page 7). However, other than the discussion of the August 10, 2021, appointment, the hearing decision did not indicate what evidence supported the evaluation (i.e., whether it referenced evaluations conducted by Dr. Amin or another source). If referencing only records from Dr. Amin, then the only evidence cited to support the consistency factor is the claimant's denial of symptoms. In addition, the assessment was discounted

> due to marijuana use absent performance of a materiality analysis. Therefore,
> further evaluation of the PAMFs and opinion evidence is required consistent
> with the regulations outlined in 20 CFR 404.1520c and Social Security Ruling
> 13-2p.

(Tr. 1490-91.)   The Appeals Council directed the ALJ to "[g]ive further consideration to the medical source opinion(s) and prior administrative medical findings pursuant to the provisions of 20 CFR 404.1520c." (*Id.* at 1491.)

After remand, the ALJ analyzed opinions of the state agency reviewing psychologists, as well as the opinions of Dr. Amin, as follows:

> As to the claimant's mental limitations, the undersigned finds somewhat
> persuasive the prior administrative findings of State agency psychological
> consultants, Joan Williams, PhD, and Ermias Seleshi, MD (1A; 3A).
> Considering the claimant's mental impairments, including substance addiction
> disorders, Drs. Williams and Seleshi opined in June and November 2020,
> respectively, that the claimant has moderate limitation in his ability to
> understand, remember, and apply information; interact with others;
> concentrate, persist, or maintain pace; and adapt and manage himself. Both
> Drs. Williams and Seleshi summarized that the claimant "retains mental
> abilities for simple work tasks, routines, social exchanges, and adjustments"
> (1A/6; 3A/6). A finding of moderate limitation in the claimant's mental
> function is supported by the analysis of the evidence available at the time
> rendered, which included consideration of the claimant's subjective reports,
> mental status examinations, and treatment. It is also largely consistent with the
> overall evidence and appropriately balances the claimant's subjective reports
> and abnormalities in mental status and need for more intensive treatment,
> largely with substance use, with longitudinal treatment notes documenting
> improvement/stability in symptoms with treatment compliance and sobriety
> and reasonable mental status, with appropriate appearance and interaction,
> grossly intact memory, and at least fair attention and judgment.
>
> However, the narrative explanations of Drs. Williams and Seleshi are not
> persuasive to the extent they are not expressed in vocationally relevant terms
> and, in some respects, are not consistent with the overall evidence. For
> example, Dr. Williams explained that the claimant retains the ability to
> complete repetitive tasks at a production pace, in a static setting with all
> changes explained in advance. She further explained that while the claimant
> would work best in a solitary position, he retains the ability to superficially
> relate with others (1A). Dr. Williams' opinion that the claimant "would work
> best in a solitary position," does not address the maximum the claimant can
> do. Indeed, the record reflects that in the absence of substance use, the
> claimant maintains largely appropriate appearance and interaction; however,

this has been included in the residual functional capacity finding herein in consideration of his subjective reports that he prefers to be alone. Additionally, had she intended to say the claimant needs to work in isolation, as the claimant's representative argues, then she would have said so. Furthermore, even if Dr Williams meant "he would do best in a solitary position" to mean "he would do best in an isolated position," neither addresses the maximum the claimant can do, which is interact superficially. Turning to Dr. Seleshi, he explained that the claimant can understand, remember, and follow simple instructions for routine and repetitive tasks; can perform routine tasks with flexible considerations for close concentration or fast-paced performance; can interact with others on a brief, superficial and intermittent basis in the work setting; and can adapt to work in a stable setting with predictable expectations and well explained, infrequent routine changes (3A). Dr. Seleshi's opinion that the claimant can perform routine tasks with flexible considerations for close concentration or fast-paced performance is not expressed in vocationally relevant terms. Moreover, longitudinal mental status examinations do not support a finding of significant or ongoing issues with concentration and attention. Thus, to the extent the claimant has any deficits, these are accommodated in the residual functional capacity finding herein, including limits to work involving only simple instructions for routine and repetitive tasks, and no fast-paced production work. To the extent consistent with the overall evidence, the narrative explanations of Drs. Williams and Seleshi are reflected in the residual functional capacity finding herein.

Finally, the undersigned carefully considered the opinions of the claimant's treating psychiatric provider, Jaina Amin, MD (9F; 17F). The record reflects that the claimant established treatment with Dr. Amin in January 2020 (see 4F/65). In a Mental Impairment Questionnaire completed in August 2021, Dr. Amin indicated that she sees the claimant every four months. Citing diagnoses of PTSD and alcohol dependence (in remission as of March 31, 2020), Dr. Amin opined in August 2021 that the claimant is "unable to meet competitive standards" or has "no useful ability to function" in nearly all skill areas relevant to employment, and that he would be absent from work more than 50% of the month, and off task more than 50% of the workday. Citing diagnoses of schizoaffective disorder and PTSD, Dr. Amin rendered a similar assessment when completing the same form in December 2023, except she anticipated the claimant would be off task 80% of the workday (17F). In describing the clinical findings demonstrating the severity of the claimant's mental impairment and symptoms, Dr. Amin indicated that the claimant was "having short-term memory loss" (17F/1).

Dr. Amin's assessments are unpersuasive. While the overall evidence supports a finding that the claimant experiences limitation in mental function due to his impairments, the degree assessed by Dr. Amin is not supported by her longitudinal treatment notes, which generally reflect stability in symptom with treatment compliance and reasonable mental status examinations (4F; 12F; 15F). For example, her January 2020 psychiatric intake notes document the

claimant's reasonable mental status (e.g., alert, oriented, fair grooming/hygiene, adequate language, linear thought process, logical associations, no abnormalities in thought content, adequate fund of knowledge, intact recent and remote memory, and fair judgment and insight) (see 4F; 4F/69). Dr. Amin noted similarly reasonable mental status at July 2021 and June 2022 treatment visits, as well as effectiveness of medication (see 12F/41, 42; 15F/60, 62). While Dr. Amin noted symptoms of nervousness/anxiousness at the August 2021 treatment visit, there was no evidence of difficulty concentrating or increased fatigue, and the claimant reported overall improved symptoms that occur only occasionally (12F/34). Moreover, the degree of limitation assessed by Dr. Amin is not consistent with the overall evidence. As discussed in detail above, the claimant has largely normal mental status examinations when interacting with various treating providers, including primary care and emergency care providers. For example, August 2021 sleep specialist notes indicating the claimant was pleasant, appropriately answered questions, and had normal language function and memory (11F/28). As to her responses on a December 2023 Mental Impairment Questionnaire, she noted that the claimant was having short-term memory loss; however, this is not supported by her treatment notes or observations. For example, at psychiatric visits with Dr. Amin in May and July 2023 visits, the claimant reported doing well with no issues with medication or mental health (19F/71, 94). His mental status examinations at these visits and in November and December 2023 were largely unremarkable, with appropriate appearance and interaction, normal thought content and process, intact memory, and fair judgment (19F/4-5; 19-20, 73-74; 96-97). For example, Dr. Amin's finding of grossly intact memory, including on the day the form was completed, is not consistent with a contemporaneous finding that the claimant has no useful ability to remember locations or understand and remember very short and simple instructions (see 17F/2; 19F/4-5). Finally, Dr. Amin's assessed degree of limitation is not consistent with the claimant's reported activities, discussed in detail above, which have included tending to personal care and leaving his home independently, shopping in stores, and handling money (counting change, handle a savings/checking account) with reminders (see 4E).

(*Id.* at 1414-15.)

The ALJ complied with the Remand Order and gave further consideration to the medical source opinion(s) and prior administrative medical findings as directed by the regulations.  In addition, the ALJ considered the supportability and consistency of the medical source opinions, discussing evidence that was unsupportive of disability in the process.  (*Id.*)

It is the ALJ's job to weigh the evidence and resolve conflicts, and he did so here.  While Evans would weigh the evidence differently, it is not for the Court to do so on appeal.

Again, the findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton*, 246 F.3d at 772-73.

There is no error.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: March 28, 2025                          *s/ Jonathan Greenberg*
                                              Jonathan D. Greenberg
                                              United States Magistrate Judge

## <u>OBJECTIONS</u>

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**